STATE OF NORTH CAROLINA v. RONALD CRAIG PENNINGTON

No. 477PA89

(Filed 26 July 1990)

**1. Searches and Seizures § 19 (NCI3d) — defendant indicted for felonies — authority of deputy clerk to issue search warrant**

The titles to N.C.G.S. §§ 7A-180 and -181 referring to the functions of clerks of superior court and assistant and deputy clerks "in district court matters" were not intended by the legislature to limit the authority of superior court clerks to issue search warrants within their operative counties exclusively to criminal matters to be tried in the district court. Therefore, a deputy clerk of superior court had jurisdiction to issue a search warrant to obtain samples of defendant's blood for laboratory analysis after defendant had been indicted for felonies which would be tried in the superior court.

**Am Jur 2d, Searches and Seizures §§ 71, 105.**

**2. Criminal Law § 50 (NCI3d) — new scientific method of proof — reliability**

A new scientific method of proof is admissible at trial if the method is sufficiently reliable.

**Am Jur 2d, Evidence § 818.**

**3. Criminal Law § 50 (NCI3d) — reliability of scientific procedure**

Reliability of a scientific procedure is usually established by expert testimony, and the acceptance of experts within the field is one index, though not the exclusive index, of reliability. Indices of reliability include the expert's use of established techniques, the expert's professional background in the field, the use of visual aids for the jury so that the jury is not asked to sacrifice its independence by accepting the scientific hypotheses on faith, and independent research conducted by the expert.

**Am Jur 2d, Evidence § 822.**

**4. Criminal Law § 55.1 (NCI3d) — admissibility of DNA profiling tests**

Expert testimony established the reliability of DNA profiling tests conducted by a commercial clinical laboratory so

that results of the profiling tests, which compared DNA molecules extracted from defendant's blood with DNA molecules extracted from a stain on a bedspread taken from the crime scene, were admissible in this prosecution for first degree rape, first degree sexual offense, and other crimes.

**Am Jur 2d, Evidence §§ 829, 1104, 1147.**

ON discretionary review prior to determination by the Court of Appeals pursuant to N.C.G.S. § 7A-31(b) of a judgment imposing two consecutive sentences of life imprisonment upon convictions of first-degree rape and first-degree sexual offense and consecutive sentences of fifty years for first-degree arson, twenty years for assault with a deadly weapon with intent to kill inflicting serious injury, and three years for felonious breaking and entering, entered by *Cornelius, J.,* at the 1 May 1989 Criminal Session of Superior Court, FORSYTH County. Heard in the Supreme Court 17 May 1990.

*Lacy H. Thornburg, Attorney General, by Doris J. Holton, Assistant Attorney General, for the State.*

*David F. Tamer for defendant-appellant.*

WHICHARD, Justice.

Defendant argues two assignments of error relating to his convictions for first-degree rape, first-degree sexual offense, first-degree arson, assault with a deadly weapon with intent to kill inflicting serious injury, and felonious breaking and entering. For the reasons stated below, we conclude that defendant received a fair trial free of error.

The victim testified that defendant came to the front door of her home on the afternoon of 13 July 1988 and asked if she knew of any available jobs or homes to rent. Defendant asked to come in the house to use the telephone, but the victim refused. Defendant spoke to the victim through the closed screen door for approximately twenty minutes. She eventually wrote down his name and telephone number and agreed to call him if she heard of any jobs. Her husband came home soon after defendant left, and she told him about the incident because defendant's persistence worried her. She described defendant's appearance on 13 July 1988 as different from his appearance at trial, in that on 13 July 1988 his hair was longer and more "scraggly" and his beard was fuller.

He wore no shirt, and she could see a tattoo on his back which said "Rock."

The next morning the victim was sitting in her living room watching television when she heard defendant's voice call out, "Hey, it's me," from the vicinity of her front door. The victim spoke briefly with defendant through her screen door before defendant burst through the door and began choking her. Defendant stated, "I've done this before and I'm not going back to jail this time." The victim offered defendant money, but he laughed and replied, "I don't want your money. I want you." Defendant proceeded to beat the victim with his fists and a hammer and pushed her into a bedroom. He tore off her clothes, threatened to kill her, and forced her to submit to vaginal intercourse four times while he kept his hands around her throat. Defendant performed cunnilingus on the victim, then attempted anal intercourse. When he was unable to insert his penis into the victim's anus, he picked up the hammer and struck the victim in the head. She lost consciousness briefly and awoke to find defendant engaged in anal intercourse with her. After he finished he dragged her by her hair down the hall to the master bedroom and threw her against the bed frame. The victim again lost consciousness and awoke to see defendant pulling up his pants and fastening them. He picked up the hammer and hit her in the head with it hard "like he was hammering a nail into a piece of wood." After losing and regaining consciousness again, the victim discovered defendant was beating and scraping her legs with the hammer. The victim began calling defendant "Tim," hoping that he would leave if he thought she could not identify him, but defendant angrily insisted that his name was Ronnie Pennington. Defendant opened his wallet and showed the victim a computer-generated document bearing the name "Ronald Pennington." He struck the victim in the head with the hammer several more times, then pulled the drapes off the windows and set them on fire. As the victim lay on the floor watching, defendant yelled at her not to look at him, then inflicted more blows on her head and legs with the hammer. The victim lost consciousness and did not awaken for five days.

The victim's husband testified that on 14 July 1988 he called his wife at 12:30 p.m., as he did every day. When the telephone remained busy for half an hour he became concerned and left work. Arriving home at approximately 1:20 p.m., he found his house filled

with smoke and his wife naked, bleeding, and unconscious on the bedroom floor.

Dr. Timothy Garner, a neurosurgeon, testified that the victim suffered two depressed skull fractures and lost a large amount of blood from multiple scalp lacerations. Brain matter was visible outside her skull prior to surgery. Dr. Garner performed two craniotomies to repair the victim's skull fractures and remove dead brain tissue. Her vision was permanently affected by damage to the right parietal region of the brain. Despite what Dr. Garner called a miraculous recovery, the victim remained on medication to prevent brain seizures at the time of trial.

Dr. Richard Weaver, an ophthalmologist, testified that the victim suffered a left-sided visual field defect as a result of her injuries. This defect results in a lack of awareness of objects on the left side of the visual field. Dr. Weaver testified, "It's like you hold your hand behind where you can see, it's not black, but you just have no awareness that your hand is there."

Recovery of physical evidence from the crime scene proved difficult because of the smoke and soot occasioned by the fire. Detective H.E. Warren of the Forsyth County Sheriff's Department testified that he found a hammer, identified by the victim as the weapon defendant used to assault her, in the woods near the victim's home. The State's fingerprint expert identified a latent print matching defendant's left little finger on a strip of metal found a few feet from the hammer. In addition, the expert testified that a latent palm print found on the front door molding of the victim's home matched that of defendant. Detective Warren testified that a photograph of defendant's back taken on 17 July 1988 accurately portrayed defendant's tattoo. The photograph showed the words "Rock" and "Ron" along with a musical symbol and a star.

Samples collected from the victim revealed the presence of spermatozoa in her vagina and rectum. A stain taken from the bedspread on the bed upon which defendant raped the victim also revealed the presence of spermatozoa. Tests conducted on the vaginal swab and the bedspread showed that the sources of the specimens were of blood type A secretor. Blood samples from the victim and defendant revealed that both are type A secretors. The expert serologist defined a secretor as an individual who secretes characteristics identifying his blood type into his body fluids.

## STATE v. PENNINGTON

[327 N.C. 89 (1990)]

The trial court conducted a lengthy voir dire hearing on the admissibility of evidence of deoxyribonucleic acid (DNA) analysis conducted by Cellmark Diagnostics, Inc. (Cellmark), a commercial clinical laboratory located in Germantown, Maryland. It concluded that the proffered evidence was reliable and based on established scientific methods generally accepted within the fields of microbiology and molecular biology, and allowed admission of evidence pertaining to the DNA analysis.

Dr. George Herrin, a staff scientist at Cellmark and an expert in the field of molecular biology specializing in the identification of DNA, testified that on 18 November 1988 the State Bureau of Investigation submitted to Cellmark a vaginal swab and a cutting from a bedspread. Cellmark also received blood samples from defendant, the victim, and the victim's husband. The samples remained within Dr. Herrin's custody until their return to the Forsyth County Sheriff's Department.

Dr. Herrin explained to the jury that DNA is the chemical which encodes all genetic information. DNA is located in the nucleus of all nucleated cells in the human body, remains constant throughout a person's life, and is identical in each cell—*i.e.*, the DNA extracted from a man's blood cells is identical to the DNA extracted from his sperm cells. Each person's DNA is unique, with the exception of that of identical twins.

Dr. Herrin testified, in summary, that DNA is composed of two strands made of chains of chemical bases called nucleotides. Each nucleotide is one of four chemicals which compose a four-letter organic alphabet. The strands are very long, containing billions of nucleotides which can be arranged in any order along the strand. The order of the nucleotides determines certain characteristics which will be expressed in an individual's physical or mental traits. Each sequence of nucleotides which encodes for a specific characteristic is a gene, and can be thought of as one word using the four-letter alphabet. The two strands are joined together and twisted into a shape referred to as a double helix, which can be envisioned schematically as a twisted ladder. The order of the nucleotides on the opposing strand is complementary in that certain nucleotides always pair with one another. It is possible to separate the two strands of DNA, and they will rejoin in the original manner because of the specific ways nucleotides pair with one another.

**STATE v. PENNINGTON**

[327 N.C. 89 (1990)]

The type of DNA analysis performed by Cellmark is called restriction fragment length polymorphism, or RFLP. Thompson and Ford, *DNA Typing: Acceptance and Weight of the New Genetic Identification Tests*, 75 Va. L. Rev. 45, 48-49 (1989) [hereinafter Thompson and Ford].[1] RFLP analysis is also known as DNA fingerprinting or profiling,[2] and can be performed on any biological sample from which DNA can be extracted. The biological material is first separated from other cells or, if dried on a surface such as cloth, washed from the cloth. Chemicals are used to open the cells, releasing the DNA into a solution, after which it is purified. Because of the long length of DNA molecules, the molecule is cut into fragments of more workable length using restriction enzymes, which search out certain sequences in the nucleotide alphabet and cut the chains at those specified points. Because the order of the nucleotides differs from person to person, the length of these fragments will differ among individuals as well.

During the next step the DNA fragments are sorted according to length. A gel is prepared with wells or holes in one end, into which the scientist injects the DNA solution. An electric current is applied, which draws the negatively-charged DNA through the gel. The smaller fragments move faster than the longer ones, resulting in the DNA fragments being arrayed across the gel according to their lengths. The DNA fragments are removed from the gel and blotted onto a white nylon membrane, which serves as a more permanent surface, using a procedure called "Southern transfer." Chemicals are used to unwind the double-stranded DNA molecules so that single strands of the nucleotide bases are affixed to the nylon membrane.

---

1. Both Cellmark and Lifecodes Corporation (Lifecodes) perform RFLP analysis. Lifecodes is a commercial clinical laboratory located in Valhalla, New York. A third commercial laboratory, Cetus Corporation of Emeryville, California, also performs DNA analysis, but uses a markedly different technique than that employed by Lifecodes and Cellmark. Thompson and Ford, 75 Va. L. Rev. at 48-50. At the time of this trial, only these three commercial laboratories and the FBI laboratory at Quantico, Virginia performed DNA analysis on forensic samples. For detailed descriptions of RFLP analysis, see Thompson and Ford, 75 Va. L. Rev. at 64-76, and Note, *The Dark Side of DNA Profiling: Unreliable Scientific Evidence Meets the Criminal Defendant*, 42 Stan. L. Rev. 465, 472-74 (1990) [hereinafter Note].

2. The Ad Hoc Committee on Individual Identification by DNA Analysis, a group formed by the American Society of Human Genetics, prefers the term "DNA profile" to "DNA fingerprint." *Individual Identification by DNA Analysis: Points to Consider*, 46 Am. J. Hum. Genet. 631, 631 (1990).

**STATE v. PENNINGTON**

[327 N.C. 89 (1990)]

Radioactive probes are then used to search for specific sequences of nucleotides along the chain. The probe is a relatively short single-stranded piece of DNA that has been tagged with radioactivity so that it can be traced. Because of the specific way nucleotides pair up when the DNA is in its double-stranded form, the probes can search for specific complementary sequences in the nucleotide chains and lock onto them. The excess probe solution is washed away, then the membrane is exposed to x-ray film, producing a pattern of black bands on the x-ray film corresponding to where the DNA probe bound to the membrane. The pattern is inspected by scientists at Cellmark to determine whether the banding pattern of the forensic sample matches that of the submitted known samples.

Dr. Herrin testified that he performed the described procedures on the vaginal swab and bedspread cutting submitted in the present case. The process did not yield a readable result from the vaginal swab. The bedspread cutting yielded a banding pattern which matched that obtained from the blood of defendant. Using four single-locus probes combined in a solution, defendant's blood analysis revealed six bands. Five of these bands matched the banding pattern yielded from the bedspread cutting. Dr. Herrin opined that the top band was missing from the bedspread cutting due to partial degradation of the DNA sample. Dr. Herrin testified that in his opinion the DNA on the bedspread cutting came from defendant. Statistically, the banding pattern of the bedspread cutting would occur randomly in one of twenty-four million Caucasians. This statistic is based on the assumption that each probe is independent of all other probes—that the nucleotide sequence which each seeks occurs randomly and independently of the nucleotide sequences sought by the other probes used. Experimental data indicates that the probes used by Cellmark are independent of one another.

On cross-examination Dr. Herrin agreed that Cellmark erred by misidentifying as a match one sample out of forty-nine submitted in a proficiency test conducted by the California Association of Crime Lab Directors. The error occurred when a label rubbed off a tube and the sample was incorrectly recombined with a sample from a different source. In response to the error Cellmark purchased a large centrifuge to eliminate the need to split and recombine samples. Other than human error of this type or deliberate tampering, Dr. Herrin opined that there was no way to obtain

a false match. Technical difficulties would lead to no result or a false negative rather than a false positive.

Defendant presented evidence tending to impeach the victim's identification of defendant as her assailant. Dr. Frank Wood, a neuropsychologist at Bowman Gray School of Medicine, testified that he had examined the victim on two occasions in the six weeks following the assault. Her performance on tests of verbal reasoning was completely normal, but her performance on the tests measuring nonverbal performance was extremely low compared to her verbal abilities. In Dr. Wood's opinion, her brain injuries had severely impaired her visual memory and thus her ability to recognize all but the most familiar faces. In addition, defendant's girlfriend, Patricia Norman, testified that defendant was with her on 14 July 1988 until 11:20 a.m., when she left for work.

[1] Defendant first assigns error to the trial court's denial of his motion to suppress evidence obtained pursuant to a search warrant issued 15 November 1988 by the deputy clerk of Superior Court, Forsyth County. Law enforcement officers procured the warrant for the purpose of obtaining samples of defendant's blood for laboratory analysis. Defendant argues that the clerk of superior court was without jurisdiction to issue the warrant.

N.C.G.S. § 15A-243 provides:

(a) A search warrant valid throughout the State may be issued by:

  (1) A Justice of the Supreme Court.

  (2) A judge of the Court of Appeals.

  (3) A judge of the superior court.

(b) Other search warrants may be issued by:

  (1) A judge of the district court as provided in G.S. 7A-291.

  (2) *A clerk as provided in G.S. 7A-180 and 7A-181.*

  (3) A magistrate as provided in G.S. 7A-273.

N.C.G.S. § 15A-243 (1988) (emphasis added). N.C.G.S. § 7A-180(5) authorizes superior court clerks to issue search warrants "valid throughout the county of the issuing clerk." N.C.G.S. § 7A-180(5) (1989). N.C.G.S. § 7A-181 confers upon deputy clerks of superior court "the same powers as the clerk of superior court with respect

to the issuance of warrants . . . ." N.C.G.S. § 7A-181(2) (1989). But for the titles of sections 7A-180 and -181, the deputy clerk's authority to issue a search warrant within Forsyth County would be unimpeachable. However, N.C.G.S. § 7A-180 is entitled "Functions of clerk of superior court *in district court matters*." (Emphasis added.) N.C.G.S. § 7A-181 bears the title "Functions of assistant and deputy clerks of superior court *in district court matters*." (Emphasis added.) These titles appear in the enacting legislation. 1965 N.C. Sess. Laws ch. 310, § 1. Defendant argues that these titles restrict the jurisdiction of clerks in issuing warrants to district court matters. Because indictments had been returned against him, defendant argues that jurisdiction over all matters relating to his trial rested with the Superior Court, Forsyth County, at the time the warrant was issued.

We disagree with defendant's premise that the issuance of a search warrant in a felony case is within the exclusive jurisdiction of the superior court and thus is not a "district court matter" within the meaning of the titles of N.C.G.S. §§ 7A-180 and -181. The issuance of a search warrant is neither a district court matter nor a superior court matter, but pertains to pretrial investigation which need not—indeed, often cannot at that point—be classified according to the court where the defendant may eventually be tried. Prior to a search for evidence, it will often be impossible to know with what crimes a suspect may eventually be charged, and thus the appropriate division for trial.

The titles to N.C.G.S. §§ 7A-180 and -181 are mainly of historical importance. Chapter 7A of the General Statutes was enacted "to implement Article IV of the Constitution of North Carolina and promote the just and prompt disposition of litigation by . . . (3) [c]reating the district court division of the General Court of Justice . . . [and] (5) [p]roviding for the organization, jurisdiction and procedures necessary for the operation of the district court division . . . ." N.C.G.S. § 7A-2 (1989). The primary purpose of Article IV of the Constitution of North Carolina, as amended in 1962, "was to establish 'a unified judicial system.'" *State v. Matthews*, 270 N.C. 35, 42, 153 S.E.2d 791, 797 (1967) (quoting N.C. Const. art. IV, § 2). In prescribing the organization and procedure of the newly created district court division, we do not believe the General Assembly intended to limit the authority of superior court clerks to issue search warrants within their operative counties exclusively

to criminal matters to be tried in district court. This assignment of error is overruled.

Defendant filed a motion in limine seeking to prohibit the prosecutor from introducing into evidence any results obtained from the DNA profile testing performed by Cellmark. Following a lengthy voir dire, the trial court denied the motion and overruled defendant's objection to the evidence. Defendant assigns error to this ruling, arguing that DNA profiling is insufficiently reliable to justify its admission into evidence.

[2, 3] A new scientific method of proof is admissible at trial if the method is sufficiently reliable. *State v. Bullard*, 312 N.C. 129, 148, 322 S.E.2d 370, 381 (1984); 1 Brandis on North Carolina Evidence, § 86, at 385 (1988). Reliability of a scientific procedure is usually established by expert testimony, and the acceptance of experts within the field is one index, though not the exclusive index, of reliability. *See State v. Bullard*, 312 N.C. at 147, 322 S.E.2d at 380; *State v. Peoples*, 311 N.C. 515, 532, 319 S.E.2d 177, 187 (1984). Thus we do not adhere exclusively to the formula, enunciated in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), and followed in many jurisdictions, that the method of proof "must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Id.* at 1014. Believing that the inquiry underlying the *Frye* formula is one of the reliability of the scientific method rather than its popularity within a scientific community, we have focused on the following indices of reliability: the expert's use of established techniques, the expert's professional background in the field, the use of visual aids before the jury so that the jury is not asked "to sacrifice its independence by accepting [the] scientific hypotheses on faith," and independent research conducted by the expert. *State v. Bullard*, 312 N.C. at 150-51, 322 S.E.2d at 382.

[4] The trial court heard testimony from three expert witnesses for the State and one expert for defendant during the voir dire hearing. Michael DeGuglielmo, a forensic serologist with the State Bureau of Investigation, had visited Cellmark and observed its laboratory procedures. He testified that the DNA profiling procedure used at Cellmark is reliable and is generally accepted within the scientific community. He testified further that if contaminants are present in a forensic sample, the sample is either unaffected or degraded so that it yields an unreadable result.

STATE v. PENNINGTON

[327 N.C. 89 (1990)]

Wesley Kloos, professor of genetics and microbiology at North Carolina State University, testified that he had been working with techniques aimed at isolating and extracting DNA for twenty-two years. He testified that the individual steps used in DNA profiling, as performed by Cellmark, have been accepted within the scientific community. Specifically, he stated that methods for extracting DNA from cells were developed in the 1950s, restriction enzymes have been used since the 1970s, and the "Southern transfer" technique was described in 1975. DNA probing has been performed for the last fifteen years, though the specific probes and techniques used by Cellmark were described in 1985.

Dr. George Herrin testified that he had been employed as a staff scientist at Cellmark for a year and a half. He testified to essentially the same matters reflected in the summary of his subsequent testimony before the jury, set forth above. In addition, he discussed the quality control procedures followed by Cellmark. A lab accession number is assigned to each sample received and is checked at each step of the procedure. One scientist ordinarily works on a sample from start to finish, then analyzes the match between known and unknown samples. A second scientist makes a completely independent assessment of the match. To date, scientists at Cellmark have never disagreed about the existence of a match. Defendant's known sample and the sample obtained from the bedspread matched on five of six bands. The top band did not match due to partial degradation of DNA obtained from the bedspread sample, as verified by quality control procedures. The vaginal swab submitted contained sufficient DNA for analysis, but the restriction enzymes did not cut the DNA into fragments. Therefore, no results were obtained from that sample.

Defendant's expert witness, J. Stoerker, an assistant professor of microbiology at the University of North Carolina at Charlotte, suggested that a different DNA analysis technique, the polymer chain reaction test employed by another commercial laboratory, would yield results "less equivocal" than those obtained in the present case. Dr. Stoerker agreed that the process used by Cellmark was reliable within limits but that he had had "very little time to make an analysis with regard to controls and various other things that I normally would make in interpreting data."

Based on the foregoing testimony, the trial court concluded that "the test sample in this case is reliable and that it is based

on scientifically established scientific methods which have a general acceptance within the field of microbiology and molecular biology." We agree. The expert testimony was uncontradicted that the method of proof in question, DNA profiling, uses established techniques considered reliable within the scientific community. Dr. Herrin, who conducted the DNA profiling analysis in this case and testified before the jury, earned a Ph.D. in biochemistry with a specialty in molecular biology, which he defined as the study of DNA, from Rice University in 1985. He then completed two and one-half years of post-doctoral research in molecular biology at Texas A & M University before joining Cellmark as a senior staff scientist. In his year and one-half at Cellmark, he had conducted DNA profile testing on over one hundred samples and supervised the performance of testing on other samples. Dr. Herrin had published over a dozen articles and abstracts in the field of molecular biology.

Dr. Herrin made every attempt to explain the DNA profiling process in simple language and used several visual aids to assist the jury in understanding the structure of DNA and the DNA profiling process. He displayed the radiograph of the test results to the jury during his testimony. Thus, the jury was not asked "to sacrifice its independence by accepting [the] scientific hypotheses on faith," *State v. Bullard*, 312 N.C. at 151, 322 S.E.2d at 382, but had a basis for evaluating the expert testimony. We agree with the trial court that the expert testimony in this case established the reliability of the DNA profiling process, and we thus hold that the evidence of the DNA profile testing results was properly admitted.

We note that appellate courts in other jurisdictions have reached the same conclusion and result. *Andrews v. State*, 533 So.2d 841 (Fla. Dist. Ct. App. 1988), *review denied*, 542 So.2d 1332 (Fla. 1989); *State v. Ford*, --- S.C. ---, 392 S.E.2d 781 (1990); *Glover v. State*, 787 S.W.2d 544 (Tex. Ct. App. 1990); *Spencer v. Commonwealth*, 238 Va. 275, 384 S.E.2d 775 (1989), *cert. denied*, --- U.S. ---, 107 L. Ed. 2d 775 (1990); *State v. Woodall*, 385 S.E.2d 253 (W.Va. 1989) (evidence of DNA test held inadmissible under the particular facts, but court noted that reliability of those tests is now generally accepted and such evidence is generally admissible).

We are aware of criticism by commentators that the type of DNA analysis employed by Cellmark is not infallible, particularly

IN RE ESTATE OF FRANCIS

[327 N.C. 101 (1990)]

in a forensic setting. *See* Thompson and Ford, *passim*; Note, *passim*. While we hold that evidence of DNA profile testing is generally admissible and was admissible in the present case, this should not be interpreted to mean that DNA test results should always be admitted into evidence.

> The admissibility of any such evidence remains subject to attack. Issues pertaining to relevancy or prejudice may be raised. For example, expert testimony may be presented to impeach the particular procedures used in a specific test or the reliability of the results obtained. *See, e.g., People v. Castro*, 144 Misc.2d 956, 545 N.Y.S.2d 985 (1989). In addition, traditional challenges to the admissibility of evidence such as the contamination of the sample or chain of custody questions may be presented. These issues relate to the weight of the evidence. The evidence may be found to be so tainted that it is totally unreliable and, therefore, must be excluded.

*State v. Ford*, --- S.C. at ---, 392 S.E.2d at 784. *See also State v. Schwartz*, 447 N.W.2d 422, 428 (Minn. 1989) (DNA typing using RFLP analysis admissible if performed in accordance with appropriate laboratory standards and controls; expert testimony in this case established that Cellmark had not met minimum guidelines).

No error.