BRYANT, Judge.
 

 *254
 
 Where defendant and defense counsel reached an impasse as to whether to cross-examine the State's witness on an issue of sample contamination, we affirm the trial court's ruling that it would be improper for the attorney to pursue a frivolous line of questioning. And where, as defendant concedes, our laws do not support a jury instruction for mistake of age or consent on facts such as these, we overrule defendant's argument.
 

 On 15 July 2013, a Mecklenburg County grand jury indicted defendant Stephen Lamont Ward on two counts of statutory rape of a person thirteen, fourteen, or fifteen years old and two counts of taking indecent
 
 *255
 
 liberties with a child. These matters were brought to trial during the 28 April 2015 Criminal Session of Mecklenburg County Superior Court, the Honorable Robert T. Sumner, Judge presiding.
 

 At trial, the evidence tended to show that in June 2013, fourteen-year-old Rebecca
 
 [1]
 

 ,
 

 [2]
 
 a Mecklenburg County resident, received a message via the social networking site Facebook inviting her to apply for a modeling opportunity with Fourth Ward Foto. At trial, Rebecca identified defendant as the person in the profile picture for the webpage. Rebecca corresponded with defendant by messages sent via Facebook and by phone for two days, and then agreed to meet him. On 28 June 2013, after her stepfather dropped her off at a library, Rebecca walked to meet defendant at a local pizzeria.
 

 Q. What did you think you were meeting him to do?
 

 A. Just take pictures, you know, what models do, just things like that. Like, you know, face shots and all that kind of stuff.
 

 Rebecca got into defendant's black Durango SUV and traveled with him to a motel on Nations Ford Road. Defendant had not previously told Rebecca he was taking her to a motel. Rebecca testified that
 
 en route
 
 , defendant stopped at a gas station and purchased two cigars and a grape juice drink. Once in
 
 *581
 
 his motel room, Rebecca and defendant talked while she drank grape juice, which defendant later told her contained vodka. Defendant undressed Rebecca, kissed and fondled her body, then performed cunnilingus and twice engaged her in sexual intercourse. Afterwards, defendant directed her to pose in various positions for photographs. Rebecca was in defendant's motel room for three to four hours. During that time, her parents' numerous calls to her cellphone went unanswered.
 

 When defendant returned Rebecca to the library, she contacted her parents and, over the course of the night, eventually disclosed where she had been. The next day, Rebecca directed her parents to the motel where defendant had taken her, and there, Rebecca's mother and step father confronted defendant. Rebecca was then taken to Novant Health, a hospital, and her parents reported to law enforcement officers in the Charlotte Mecklenburg County Police Department that their daughter
 
 *256
 
 had been kidnapped and sexually assaulted. Officer David Wright was among the officers that arrived at the motel to investigate.
 

 Officer Wright testified that a search warrant was issued for the room to which Rebecca was taken, as well as for the black Durango SUV in the motel parking lot. In the vehicle, officers found a vehicle registration card, a visa card with defendant's picture on it, and a bottle of Smirnoff Vodka. It was also confirmed that the room Rebecca had been taken to had been rented by defendant.
 

 Following his arrest, defendant was transported to the Charlotte Mecklenburg Police Department. There, he waived his
 
 Miranda
 
 rights and agreed to speak with Officer Wright. Defendant gave his date of birth as 12 October 1972, making him forty years old at the time of his arrest. Defendant stated that he made contact with Rebecca on 28 June 2016 by "face messaging" her through Facebook for the purpose of making arrangements to take her photograph. He met Rebecca at a local restaurant and then drove her to the motel on Nations Ford Road. Defendant stated that Rebecca agreed to take nude pictures for him, and he took fifteen nude or partially nude photographs. But after the confrontation with Rebecca's mother and step-father, he deleted the photos. Defendant denied having sex with Rebecca. After the interview, defendant submitted to a cheek scraping for the collection of his DNA.
 

 At trial, a certified Sexual Assault Nurse Examiner (SANE) with Novant Health testified about her examination of Rebecca. On 29 June 2013, the nurse collected specimen samples from Rebecca for a rape kit and recorded Rebecca's medical history. In testimony admitted for the purpose of corroboration, the SANE nurse testified to the statement Rebecca gave in her medical history regarding the events which brought her to the motel room on 28 June and the conduct that occurred inside. The testimony was substantially similar to Rebecca's trial testimony.
 

 The last witness the State called was a DNA analyst working with the Charlotte Mecklenburg Police Crime Lab. Prior to her testimony, the trial court heard
 
 ex parte
 
 arguments, out of the presence of the jury and the prosecutor, from defendant and his trial counsel to resolve an impasse regarding a proposed line of questioning intended for cross-examination. The trial court ruled in favor of defendant's trial counsel, and the trial resumed.
 

 DNA analyst Aby Moeykens, with the Charlotte Mecklenburg Police Crime Lab, had been a DNA analyst for twelve years and after stating her credentials was accepted without objection as an expert in DNA analysis and forensic DNA analysis. Moeykens testified that she "was asked to
 
 *257
 
 analyze a buccal standard from [defendant] and ... [a] buccal standard from [Rebecca], vaginal swabs, external genitalia swabs, crotch with stains from the underpants, ... [as well as] fingernail swabs." "[T]he DNA profile obtained from [defendant] matched the major DNA profile obtained from the vaginal swabs." Moeykens testified that the probability of selecting another individual who would match the DNA profile was "approximately 1 in 2.54 quadrillion." Moeykens further testified that defendant's DNA profile matched the DNA profile obtained from sperm cell fractions taken from Rebecca's external genitalia, as well as her underwear.
 
 *582
 
 Defendant did not present any evidence.
 

 The jury returned guilty verdicts against defendant as charged: two counts of statutory rape; and two counts of indecent liberties with a child. In accordance with the jury verdicts, the trial court entered a consolidated judgment against defendant on the charges of one count of statutory rape and one count of indecent liberties with a child, imposing an active sentence of 240 to 348 months and a second consolidated judgment reflecting the remaining counts of those charges, imposing a sentence of 150 to 240 months, to be served consecutively. Defendant appeals.
 

 _________________________
 

 On appeal, defendant raises two issues: whether the trial court erred by (I) settling an impasse between defendant and defense counsel in favor of defense counsel; and (II) denying defendant's request for an instruction on mistake of age as well as consent.
 

 I
 

 Defendant first argues the trial court erred by ruling that defense counsel's trial strategy determined whether a witness would be cross-examined despite defendant's objection to counsel's strategy. Defendant contends that the trial court's ruling violated his Sixth Amendment right to assistance of counsel and on the evidence presented before the trial court, entitles defendant to a new trial. We disagree.
 

 Standard of review
 

 We note defendant contends that our standard of review is de novo, while the State seems to argue the standard is abuse of discretion. As defendant raises a constitutional issue, we will review the matter
 
 de novo
 
 .
 
 State v. Whitaker
 
 ,
 
 201 N.C.App. 190
 
 , 192,
 
 689 S.E.2d 395
 
 , 396 (2009) ("The standard of review for questions concerning constitutional rights is de novo." (citation and quotation marks omitted)),
 
 aff'd
 
 ,
 
 364 N.C. 404
 
 ,
 
 700 S.E.2d 215
 
 (2010).
 

 *258
 

 Analysis
 

 In our review of the issue, we find guidance from our Supreme Court in
 
 State v. Ali
 
 ,
 
 329 N.C. 394
 
 ,
 
 407 S.E.2d 183
 
 (1991). At trial, the defendant and his trial counsel reached an impasse during jury voir dire. Namely, the defendant wanted to accept a juror that counsel recommended be excused.
 
 Ali
 
 ,
 
 329 N.C. at 402
 
 ,
 
 407 S.E.2d at 188-89
 
 . Out of the presence of the jury and for the record, trial counsel noted his exception to the juror, but speaking for the defendant, accepted the juror.
 
 Id.
 
 at 402,
 
 407 S.E.2d at 188-89
 
 . Following his conviction, the defendant appealed, arguing that his trial counsel should have made the final determination as to whether the juror would be accepted, and that trial counsel's failure to make that determination deprived the defendant of his Sixth Amendment right to counsel.
 

 Id.
 

 Our Supreme Court noted that "[t]he attorney-client relationship 'rests on principles of agency, and not guardian and ward.' "
 
 Id.
 
 at 403,
 
 407 S.E.2d at 189
 
 (quoting
 
 State v. Barley
 
 ,
 
 240 N.C. 253
 
 , 255,
 
 81 S.E.2d 772
 
 , 773 (1954) ). The
 
 Ali
 
 Court acknowledged the prior holding of this Court while clarifying the duty of an attorney who reaches an impasse with the client, as to tactical trial strategy.
 

 [T]actical decisions, such as which witnesses to call, "whether and how to conduct cross-examinations, what jurors to accept or strike, and what trial motions to make are ultimately the province of the lawyer...."
 
 State v. Luker
 
 ,
 
 65 N.C.App. 644
 
 , 649,
 
 310 S.E.2d 63
 
 , 66 (1983),
 
 aff'd as to error, rev'd as to harmlessness of error
 
 ,
 
 311 N.C. 301
 
 ,
 
 316 S.E.2d 309
 
 (1984). However, when counsel and a fully informed criminal defendant client reach an absolute impasse as to such tactical decisions, the client's wishes must control; this rule is in accord with the principal-agent nature of the attorney-client relationship.
 

 Id.
 

 at 404
 
 ,
 
 407 S.E.2d at 189
 
 (alteration in original). In such a conflict, the
 
 Ali
 
 Court recommended that the attorney make a record of the circumstances, her advice to the defendant, her reasons for the advice, the defendant's decision, and the conclusion reached.
 

 Id.
 

 ;
 
 accord
 

 State v. Floyd
 
 ,
 
 238 N.C.App. 110
 
 , 125-26,
 
 766 S.E.2d 361
 
 , 372-73 (2014) (holding the defendant was entitled to a new trial where an impasse was reached between the defendant and his trial counsel
 
 *583
 
 as to the extent of cross-examination, the trial court failed to inquire into the nature of the impasse or rule on the dispute, and on appeal, the State failed to assert that the violation was harmless error),
 
 review allowed, writ allowed
 
 , --- N.C. ----,
 
 771 S.E.2d 295
 
 (2015).
 
 *259
 
 Given this procedure, we note that this Court has held that despite a conflict, trial counsel is
 
 not compelled
 
 to pursue strategy or tactical decisions based on frivolous or unsupported claims.
 

 [The] [d]efendant in this case sought to have his attorneys follow instructions to present claims that they felt "ha[d] no merit." Thus, the impasse was not over "tactical decisions," but rather over whether [the] Defendant could compel his counsel to file frivolous motions and assert theories that lacked any basis in fact. Nothing in
 
 Ali
 
 or our Sixth Amendment jurisprudence requires an attorney to comply with a client's request to assert frivolous or unsupported claims. In fact, to do so would be a violation of an attorney's professional ethics: "A lawyer
 
 shall not
 
 bring or defend a proceeding, or assert or controvert an issue therein,
 
 unless
 
 there is a
 
 basis in law or fact
 
 for doing so that is
 
 not frivolous
 
 ... [.]" N.C. St. B. Rev. R. Prof. Conduct 3.1 (emphasis added).
 

 State v. Jones
 
 ,
 
 220 N.C.App. 392
 
 , 395,
 
 725 S.E.2d 415
 
 , 417 (2012) (alteration in original).
 

 Here, we consider whether defendant's direction to his trial counsel to cross-examine the State's DNA expert on the extent of a mold contamination in the testing laboratory amounted to a tactical decision or a frivolous act.
 

 [Defense Counsel]: What the issue is in this case, the State is going to be calling a DNA expert on this matter and that expert's going to be testifying to the results of some laboratory tests that were performed in the Charlotte Mecklenburg Police Department laboratory. As part of the Discovery, the State disclosed that there had been contamination of a freezer in the laboratory with mold and that mold was found in the vicinity of and apparently on some DNA samples. They took quality control steps to determine whether there was actual contamination and they did not find any and they informed the effected [sic] parties, the defense counsel, of the contamination issue.
 

 ...
 

 Normally saying that there could be errors is not relevant unless you have evidence of errors. Now, in this case something did happen, but it is my concern that there is
 
 *260
 
 nothing from what I see of the DNA electropherogram, the actual results, to indicate that there was any damage in this case. And by the way, if DNA is degraded there is a characteristic pattern that appears, it's called a ski slope, and [I] did not see that. The larger pieces of DNA are going to get damaged first, we don't see that in this case. So it's not just that the results were there, the normal signs of degradation aren't even there. ...
 

 ...
 

 THE COURT: ... Now, does your client care to be heard with regard to this?
 

 THE DEFENDANT: Your Honor, my question was basically surrounding the fact that they had to prove their case beyond a reasonable doubt and I feel like if there is any doubt surrounding the DNA then that should be heard by the jury. ...
 

 Denying defendant's request to compel his trial counsel to examine the State's DNA expert regarding the contamination reported in the lab's freezer, the trial court made the following remark: "[Defense counsel] has an obligation not to-as he indicated, I think I've alluded to and I certainly agree with him, that raising an issue that is not an issue just when you know it's not an issue is improper." This reasoning and ruling by the trial court in the instant case is in line with the Court's reasoning in
 
 Jones,
 

 220 N.C.App. at 395
 
 ,
 
 725 S.E.2d at 417
 
 ("Nothing in
 
 Ali
 
 or our Sixth Amendment jurisprudence requires an attorney to comply with a client's request to assert frivolous or unsupported claims. In fact, to do so would be a violation of an attorney's professional ethics[.]").
 

 On the record before us, it appears that the proposed challenge to the DNA analysis performed by the Charlotte Mecklenburg Police Crime Lab on the basis of contamination
 
 *584
 
 was not a challenge rooted in relevant facts. Rather, the matter was properly considered one which is governed by rules of professional ethics for attorneys. The trial court properly denied defendant's request to compel trial counsel to pursue a line of questioning to elicit irrelevant facts.
 
 See
 
 id.
 

 Accordingly, defendant's argument is overruled.
 

 Moreover, even were we to presume the trial court erred by failing to instruct defense counsel to cross-examine the State's forensic DNA expert in the manner directed by defendant, such error would be harmless in light of the other overwhelming evidence of defendant's guilt.
 

 *261
 
 "A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless." N.C. Gen. Stat. § 15A-1443(b) (2015). "This Court has previously applied harmless error analysis to constitutional errors arising under Article I, Section 24[, Right of jury trial in criminal cases]."
 
 State v. Bunch
 
 ,
 
 363 N.C. 841
 
 , 845,
 
 689 S.E.2d 866
 
 , 869 (2010). "On a general level, an error is harmless beyond a reasonable doubt if it did not contribute to the defendant's conviction. The presence of overwhelming evidence of guilt may render error of constitutional dimension harmless beyond a reasonable doubt."
 
 Id.
 
 at 845-46, 689 S.E.2d at 869 (citation, quotation marks, and brackets omitted).
 

 In its brief to this Court, the State argues there was overwhelming evidence of defendant's guilt on the charges of indecent liberties and statutory rape sufficient to render harmless beyond a reasonable doubt any potential violation of defendant's right to counsel. We agree.
 

 The evidence presented at trial included defendant's handwritten statement to a Charlotte Mecklenburg Police Officer admitting that he was born in 1972; that, on 28 June 2016, he met Rebecca at a local restaurant, then drove her to a motel on Nations Ford Road; and that he took at least fifteen nude and partially nude pictures of Rebecca. Rebecca was born in 1998 and was fourteen years of age on 28 June 2016. Her testimony, describing how she met defendant and many of the events occurring on 28 June, was consistent with defendant's statement. Additionally, Rebecca testified that defendant provided her with grape juice mixed with vodka. A bottle of Smirnoff Vodka was recovered from defendant's black Durango SUV, parked in the motel parking lot on Nations Ford Road. Rebecca testified that after providing her with the grape juice and vodka, defendant undressed her, kissed and fondled her body, performed cunnilingus, and had sexual intercourse with her two times. Rebecca testified that defendant told her he ejaculated during sexual intercourse.
 

 Q. Did you-when you were 14, did you know what ejaculated meant?
 

 A. No.
 

 ...
 

 Q. Did you use that green washcloth to wash yourself?
 

 *262
 
 A. I did.
 

 Q. Did you see anything on the washcloth?
 

 A. It was like a little bit of blood and some white, whitish clearish stuff on there.
 

 Rebecca testified that she was in defendant's motel room for three to four hours. The next day, Rebecca was taken to Novant Health where her clothes were collected and specimen swabs were taken from her body. The SANE nurse, who collected evidence from Rebecca took a history from Rebecca during the examination. The nurse testified to the history Rebecca provided detailing the events which had occurred, including two separate acts of sexual intercourse, cunnilingus, and having nude photographs taken. The nurse corroborated that Rebecca's underwear were collected and that the nurse took external and internal swabs of Rebecca's vagina for the rape kit. A criminalist with the Charlotte Mecklenburg Police Department testified extensively regarding the scientific testing she performed on physical evidence collected in the rape kit from which she found the presence of sperm and saliva on vaginal swabs taken from Rebecca's body.
 

 *585
 
 The DNA analyst compared the DNA profile from Rebecca to defendant's DNA profile and determined that the DNA profile obtained from defendant matched the DNA profile obtained from the vaginal swabs, as well as external genitalia swabs, taken from Rebecca. The analyst further testified that the statistical calculation on the match from the vaginal swab and from the external genitalia swabs was the same-1 in 2.54 quadrillion.
 

 We note that even if on cross-examination of the forensic DNA expert, defense counsel had challenged the integrity of the DNA sample on the basis of contamination, the DNA evidence would have still been admissible, as such challenges go to the weight, not the admissibility, of the evidence.
 
 See
 

 State v. Pennington
 
 ,
 
 327 N.C. 89
 
 , 101,
 
 393 S.E.2d 847
 
 , 854 (1990) ("The admissibility of any such [DNA] evidence remains subject to attack. ... [T]raditional challenges to the admissibility of evidence such as the contamination of the sample ... may be presented. These issues relate to the weight of the evidence."). Defendant did not present any evidence that the DNA samples tested in his case were contaminated.
 

 Even presuming the trial court's failure to resolve the impasse between trial counsel and defendant in defendant's favor amounted to a violation of defendant's Sixth Amendment right to counsel, the other
 
 *263
 
 overwhelming evidence of defendant's guilt on the two counts of statutory rape of a person thirteen, fourteen, or fifteen years old and two counts of taking indecent liberties with a child would render even the constitutional error harmless beyond a reasonable doubt.
 
 See
 

 Bunch
 
 ,
 
 363 N.C. at 845-46
 
 , 689 S.E.2d at 869 ("[T]he presence of overwhelming evidence of guilt may render error of constitutional dimension harmless beyond a reasonable doubt." (citation and quotation marks omitted)). Accordingly, defendant's argument is overruled.
 

 II
 

 Next, defendant argues that the trial court erred by denying his request for instructions on "mistake of age" and consent as defenses. Despite this argument, defendant acknowledges the precedent of this Court to the contrary,
 
 see
 

 State v. Anthony
 
 ,
 
 351 N.C. 611
 
 , 616,
 
 528 S.E.2d 321
 
 , 323 (2000) ("Where the age of the victim is an essential element of the crime of rape, as in N.C.G.S. § 14-27.2(a)(1) and its predecessor statute N.C.G.S. § 14-21, the result is a strict liability offense ... [:] Consent is no defense[.]" (citation and quotation marks omitted));
 
 State v. Browning
 
 ,
 
 177 N.C.App. 487
 
 , 491-92,
 
 629 S.E.2d 299
 
 , 303 (2006) ("Statutory rape, under N.C.G.S. § 14-27.7A is a strict liability crime. Criminal
 
 mens rea
 
 is not an element of statutory rape. ... [A] mistake of fact is no defense to statutory rape." (citations and quotation marks omitted));
 
 State v. Sines
 
 ,
 
 158 N.C.App. 79
 
 , 86,
 
 579 S.E.2d 895
 
 , 900 (2003) ("The defendant was not required to have knowledge that the victim was under the age of consent in order to be convicted of attempted rape of a child." (citation omitted)). Defendant submits this argument simply to preserve the argument should the law allow for such defenses in the future. Accordingly, we do not further consider this argument.
 

 NO ERROR.
 

 Judges TYSON and INMAN concur.
 

 [1]
 

 Rebecca was sixteen at the time of trial.
 

 [2]
 

 A pseudonym has been used to protect the juvenile's identity.