BERGER, Judge.
 

 *87
 
 On March 4, 2016, Reuben Timothy Curry ("Defendant") was sentenced to life in prison after a Mecklenburg County jury found him guilty of first degree murder. Defendant alleges the trial court abused its discretion in denying defense counsel's motion to withdraw. Defendant also contends his trial counsel provided ineffective assistance on two separate grounds: (1) counsel failed to articulate "the specific nature of the problems" between counsel and Defendant such that the trial court was unable to determine if an impasse existed; and (2) counsel failed to take advantage of a third opportunity to cross-examine one of the State's witnesses. As to each of Defendant's arguments, we disagree.
 

 Factual & Procedural Background
 

 Ronny Steele ("Steele") died from a gunshot wound he suffered on February 25, 2013. Evidence presented at trial tended to show that Defendant was a participant in an ambush-style attempted robbery and ensuing "gun battle" in which Steele was killed. Defendant was indicted for first-degree murder and robbery with a dangerous weapon.
 

 Just prior to trial, Defendant provided defense counsel with a list of three facts he wished to concede: (1) he was at the scene of the crime; (2) he "had or fired a gun"; and (3)
 

 *554
 
 he was part of an attempted robbery. A closed hearing was held regarding these possible admissions, and counsel advised the trial court that Defendant's newly discovered veracity would impact his ability to handle the case and implicate
 
 Harbison
 
 concerns. Defense counsel was concerned that he could no longer be an effective advocate for Defendant "knowing what I know now."
 

 The trial court conducted the following colloquy with Defendant, in closed proceedings:
 

 THE COURT: Okay. Mr. Curry, would you stand please, sir.
 

 Once again, this conversation is not confidential but it's confidential in terms of where we are in the proceeding right now.
 

 *88
 
 The DA is not present. The jury's not present. It's just me and the court reporter, your attorney, and you, the sheriff and the clerk and a family member of yours, I believe.
 

 DEFENDANT: Yes, sir.
 

 THE COURT: What your attorney is wanting to make sure you understand is you don't have to make admissions of any kind that you were there at the scene of this occurrence, that you had or fired a gun, or that you were part of what the jury may believe was an attempted robbery. Those are all getting real close to admissions-some admissions of guilt on your part.
 

 DEFENDANT: Yes, sir.
 

 THE COURT: Do you understand that?
 

 DEFENDANT: I'm aware of it.
 

 THE COURT: And that puts your attorney in a very, very precarious position because, as the trial goes forward, his job is that you carry all the weight to the end the presumption of not guilty that's with you right now. You understand?
 

 DEFENDANT: Yes, Your Honor. I'm aware.
 

 THE COURT: Why are you asking him to say things that may tend to indicate your guilt of this matter?
 

 DEFENDANT: Because the things I asked him to say, they don't speak to the crime that I'm on trial for. So I'm really not trying to hide the fact because there were prior statements made during the investigation of this matter that the DA received and I-I had worries about them maybe introducing those statements and trying to use them as the-portray me into a liar.
 

 THE COURT: Unless you take the stand, your prior statements won't ever-the jury will never hear any statements you made-well, I take it back.
 

 They may-if you were-are there statements that are going to come in of [Defendant's] after Miranda?
 

 [DEFENSE COUNSEL]: No, Your Honor.
 

 THE COURT: Okay. And so the only statement-
 
 *89
 
 [DEFENSE COUNSEL]: Well, first there was no Miranda warnings, but that part of the interrogation, the DA elected not to proceed with that part. So the part that-
 

 THE COURT: Right. The interrogation that occurred at the law enforcement center, the DA said he's not going to use that at this point. The only thing that's going to come into evidence in terms of what you may have said were those-I think the statements at the hospital.
 

 DEFENDANT: Correct.
 

 THE COURT: Right. Those statements that you may have made at the hospital to that very first detective that showed up there. And that was Detective Redfern.
 

 DEFENDANT: Yes, sir.
 

 [DEFENSE COUNSEL]: Correct.
 

 THE COURT: But I don't think Detective Redfern's statements are going to go as far as you're asking your attorney to go in getting real close to that edge of making admissions against your interest. You're asking your attorney to ride a very fine line, in that, if he says you were there, if he says you had or fired a gun, and if he says that you may find that I was part of an attempted robbery, that's getting right up to the edge of going beyond your presumption of innocence and giving the jury stuff that you don't have to give the jury.
 

 Your attorney can-as he's done during the three or four days we've already been
 
 *555
 
 involved in this has argued to this jury at every phase that you're innocent until proven guilty beyond a reasonable doubt. He's never wavered from that. And you're asking him now to take some steps that put him in a very difficult position.
 

 It's your case. And as I told you I think when I had the discussion with you earlier, your wishes control what happens.
 

 DEFENDANT: Yes.
 

 THE COURT: You have-your attorney has to do what you say. In other words-you'll get to this point much later in the trial. If you want to testify, he might advise you not to but you-if you want to testify, no one can stop you.
 

 *90
 
 DEFENDANT: Yes, Your Honor.
 

 THE COURT: That's another part of the trial.
 

 There's a theory in the law that says, if there's an impasse between the two of you on how you should proceed, that he has to follow your wishes. Now he's worried about following-that's why he's brought it to my attention, outside of the DAs, is that he's worried that if he follows your wishes, you're putting him in a position of admitting things to this jury that he doesn't want to-I don't think he wants to admit.
 

 Do you, [defense counsel]?
 

 [DEFENSE COUNSEL]: Do not, Your Honor.
 

 THE COURT: I don't think he thinks that's in your best interest to admit these things.
 

 DEFENDANT: We spoke briefly before you entered and I was getting his advice on it. So, I mean, I may not necessarily go through with it but I just would ask him-
 

 THE COURT: Good. I'll give you some more time to talk with him about it because now that you and I have discussed it, you may see-I think that his indication is-how long have you been a defense attorney, [defense counsel]?
 

 [DEFENSE COUNSEL]: Since 1986.
 

 THE COURT: Okay. And his advice I think-I'm telling you his advice is, don't ask him to include these things in your opening statement. It's against your interest and it is perilously close to proving some things that the State really has to prove. Okay?
 

 DEFENDANT: Yes, Your Honor.
 

 THE COURT: So I'm going to give you some more time to talk to [defense counsel] regarding this and then you may ask-and then this will be part of the record but if you choose after this conversation to have him not include these things in the opening statement, they won't be included. There will be-the jury and the DA will never know about it.
 

 DEFENDANT: Okay.
 

 *91
 
 THE COURT: Okay?
 

 DEFENDANT: Yes, sir.
 

 THE COURT: So go ahead and talk to [defense counsel].
 

 Defendant and the court subsequently discussed this situation, and Defendant told the court,
 

 I mean, there's a method to my madness. I mean, I was thinking I don't want the jury to look at me as-in a deceptive manner, like I'm trying to deceive them on certain parts of the case.
 

 But we discussed this. Like I said, I told him that if he felt more confident doing it the way that he was-that he was initially going to do it, and I was fine with that.
 

 The trial court then specifically asked Defendant about the admissions and his satisfaction with counsel:
 

 THE COURT: Okay. So now what's your decision about the issue of whether you were there or the issue of whether or not you fired a gun?
 

 DEFENDANT: I leave it to him. I let him-he can go with what he had.
 

 THE COURT: You're not making any specific request that he include those things in his opening statement?
 

 DEFENDANT: No, sir, Your Honor.
 

 THE COURT: So you changed your mind regarding that issue?
 

 DEFENDANT: Yes, sir.
 

 THE COURT: Okay. And I think that's good advice that you follow-I think your attorney's advice is that you not include those things in your opening statement.
 

 *556
 
 And so you're following your attorney's advice?
 

 DEFENDANT: Yes, sir.
 

 THE COURT: Okay. Are you making that decision of your own free will, fully understanding what you're doing?
 

 DEFENDANT: Yes, sir.
 

 *92
 
 THE COURT: Do you have any questions of me regarding that decision?
 

 DEFENDANT: None, Your Honor. No, sir, Your Honor.
 

 THE COURT: Are you satisfied with your attorney's services to this point in urging that you allow him to make the opening statement that he wants to make and not include these elements that you wanted?
 

 DEFENDANT: Yes, sir.
 

 THE COURT: Are you satisfied with his services?
 

 DEFENDANT: Yes, sir.
 

 ....
 

 THE COURT: Okay. So he's going to make his opening the way he thinks it ought to be made in your behalf and not include those things-one, two, and three-that we discussed. He's not going to make those things.
 

 DEFENDANT: Yes, sir.
 

 THE COURT: And you're okay with that?
 

 DEFENDANT: Yes, Your Honor.
 

 Defense counsel again expressed to the court that the three new facts provided "five minutes before opening statement" and subsequent out-of-hand dismissal of those facts by Defendant created concerns about counsel's ability to zealously represent Defendant.
 

 At trial, defense counsel gave an opening statement in which he told the jury, among other things, that Defendant "is not guilty of attempted armed robbery," that the evidence will "show that [Defendant] did not attempt to rob anyone," and that the "evidence will show that it was not a robbery or an attempted armed robbery." These statements were contrary to the facts Defendant disclosed to counsel.
 

 Defense counsel, at the direction of the trial court and the North Carolina State Bar, filed a Motion to Withdraw As Counsel during the trial. Counsel's motion to withdraw specifically alleged the following:
 

 (1) Defendant wanted counsel to raise the three factual issues discussed above. Counsel addressed these issues with the
 
 *93
 
 trial court, and the court advised Defendant he should follow counsel's advice and not include the information in opening.
 

 (2) Defendant and defense counsel continued to discuss the request, and Defendant agreed to withdraw one of his requests.
 

 (3) When they returned to the courtroom, "[c]ounsel expressed to the [c]ourt that counsel was conflicted by what he had just learned by reading Defendant's request to be told to the jury in the Opening Statement."
 

 (4) After additional discussion with the trial court, Defendant agreed that counsel could conduct opening without Defendant's three requested facts.
 

 (5) Counsel and Defendant discussed how the proposed facts "caused a conflict in counsel's trial strategy and created a conflict concerning counsel['s] duties pursuant to the Rules of Professional Conduct."
 

 (6) At that point, "discussions with Defendant[ ] and the statements made by Defendant only tended to exacerbate the conflicts."
 

 (7) Defense counsel then believed that, based upon the seriousness of the charge and the Rules of Professional Conduct, that he needed to contact the North Carolina State Bar "to seek guidance and advice."
 

 (8) Counsel was unable to reach the appropriate person with the Bar, and provided relevant information to the court. The trial court agreed that the issue "merited a discussion with Ethics Counsel at the North Carolina State Bar."
 

 (9) Counsel spoke with Ms. Nichole P. McLaughlin, Assistant Ethics Counsel with the North Carolina State Bar, about the following: "the nature of the charge"; "the length of time counsel has represented the [D]efendant"; "where we were in the trial proceedings"; Defendant's
 
 *557
 
 request and subsequent discussions; and "how counsel perceived the information impacted the opening statement, ability to conduct effective cross examination and execute
 
 the previously prepared trial strategy
 
 going forward." (Emphasis added).
 
 *94
 
 (10) Ms. McLaughlin advised counsel to review Rules of Professional Conduct 1.1,
 
 [1]
 
 1.3,
 
 [2]
 
 1.7,
 
 [3]
 
 and 1.16,
 
 [4]
 
 reminded counsel of the confidentiality requirements of Rule 1.6,
 
 [5]
 
 and to seek the trial court's permission to withdraw because he had "a personal conflict."
 

 (11) Counsel reviewed the Rules of Professional Conduct and stated:
 

 a. "There is a conflict to counsel [sic] adherence to Rule 1.3, Diligence to the client, and Rule 3.3 Candor towards the tribunal."
 

 b. "There is a conflict to counsel [sic] adherence to Rule 1.6, Confidentiality of information and Rule 3.3, Candor towards the tribunal."
 

 c. "There is conflict pursuant to Rule 1.3, Diligence, that counsel has reservation concerning the ability to zealous [sic] advocate on client's behalf."
 

 d. Counsel's duty of candor to the trial court pursuant to Rule 3.3 "has resulted and will continue to result in such an extreme deterioration of the client-counsel relationship that counsel can no longer competently represent the client pursuant to Rule 3.3, Comment (16)."
 

 (12) Counsel was concerned that his adherence to Rule 3.3 as it relates to the cross examination of one witness may have negatively impacted Defendant.
 

 Defense counsel informed the court that the attorney-client relationship had been destroyed because "counsel does not know what to believe." Defense counsel and the court then had the following discussion:
 

 [DEFENSE COUNSEL]: I try and present my defense strategy based on what the evidence shows till the client tells me what happened. Then that does, I guess, some-impose some requirement that counsel marshal the defense that client requests. But it goes back in this case
 
 *95
 
 of whether or not I can believe what he's told me. And my conclusion at this point is that I cannot believe anything that he's told me with regard to the mere material issues at point in this case because they've changed over time.
 

 THE COURT: And that's the vacillation that I'm talking about. If he has changed what he's telling his attorney, he can't benefit from that at this stage of this trial. You'll just have to do-do the professional job that I know that you can do to represent him.
 

 The trial court denied defense counsel's motion to withdraw. The jury convicted Defendant of first-degree murder on the theories of felony murder and lying in wait, and Defendant was sentenced to life in prison without parole. The State did not proceed on the robbery with a dangerous weapon charge. Defendant gave notice of appeal in open court.
 

 Analysis
 

 Defendant contends the trial court erred in denying counsel's motion to withdraw, and alleged defense counsel provided ineffective assistance by (1) failing to articulate that an impasse existed, and (2) failing to take advantage of an additional opportunity to cross examine one of the State's witnesses. As to each of Defendant's contentions, we disagree.
 

 I.
 
 Motion to Withdraw
 

 A motion to withdraw as counsel may be granted upon "good cause" shown. N.C. Gen. Stat. § 15A-144 (2015). "Whether an attorney can withdraw as counsel is a matter in the sound discretion of the trial judge."
 
 State v. Moore
 
 ,
 
 103 N.C. App. 87
 
 , 100,
 
 404 S.E.2d 695
 
 , 702 (citation omitted),
 
 *558
 

 disc. rev. denied
 
 ,
 
 330 N.C. 122
 
 ,
 
 409 S.E.2d 607
 
 (1991). "Appellate courts will not second-guess a trial court's exercise of its discretion absent evidence of abuse."
 
 State v. Smith
 
 ,
 
 241 N.C. App. 619
 
 , 625,
 
 773 S.E.2d 114
 
 , 118-19 (citation and quotation marks omitted),
 
 disc. review denied
 
 ,
 
 368 N.C. 355
 
 ,
 
 776 S.E.2d 857
 
 (2015). "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision."
 
 State v. Hennis
 
 ,
 
 323 N.C. 279
 
 , 285,
 
 372 S.E.2d 523
 
 , 527 (1988) (citation omitted).
 

 Defense counsel set forth several purported reasons to justify his withdrawal; however, all stemmed from what the State Bar called a "personal conflict." The content of the motion and the arguments of counsel to the court demonstrate that the "personal conflict" was directly related to his inability to believe what Defendant told him. As
 
 *96
 
 the State Bar confirmed, defense counsel did not have an actual conflict, and there is no evidence he breached the rules of professional conduct. Counsel had represented Defendant for nearly three years, and had presumably expended significant time and resources preparing for trial. In addition, there was no disagreement about trial strategy, nor was there an identifiable conflict of interest. The trial court was correct to advise defense counsel that he would "just have to do-do the professional job that I know that you can do to represent him." It cannot be said that the trial court's denial of the motion to withdraw was arbitrary or manifestly unsupported by reason.
 

 Moreover, Defendant is required to show prejudicial error resulted from the denial of the motion to withdraw.
 
 State v. Thomas
 
 ,
 
 350 N.C. 315
 
 , 328,
 
 514 S.E.2d 486
 
 , 495 ("In order to establish prejudicial error arising from the trial court's denial of a motion to withdraw, a defendant must show that he received ineffective assistance of counsel." (citation omitted)),
 
 cert. denied
 
 ,
 
 528 U.S. 1006
 
 ,
 
 120 S.Ct. 503
 
 ,
 
 145 L.Ed.2d 388
 
 (1999). As more fully discussed below, Defendant has failed to establish a reasonable probability of a different result in this case.
 

 II.
 
 Ineffective Assistance of Counsel
 

 Ineffective assistance of counsel ("IAC") claims are typically "considered through a motion for appropriate relief filed in the trial court and not on direct appeal."
 
 State v. Mills
 
 ,
 
 205 N.C. App. 577
 
 , 586,
 
 696 S.E.2d 742
 
 , 748 (2010) (citing
 
 State v. Stroud
 
 ,
 
 147 N.C. App. 549
 
 , 553,
 
 557 S.E.2d 544
 
 , 547 (2001) ).
 
 See also
 

 State v. Dockery
 
 ,
 
 78 N.C. App. 190
 
 , 192,
 
 336 S.E.2d 719
 
 , 721 (1985) ("The accepted practice is to raise claims of ineffective assistance of counsel in post-conviction proceedings, rather than direct appeal." (citation omitted)). "However, a defendant's ineffective assistance of counsel claim brought on direct review will be decided on the merits when the cold record reveals that no further investigation is required...."
 
 Mills
 
 ,
 
 205 N.C. App. at 586
 
 ,
 
 696 S.E.2d at 748
 
 (citation and quotation marks omitted). No further investigation is necessary in this matter as there is ample evidence in the record to decide Defendant's two IAC claims.
 

 Under the Sixth and Fourteenth Amendments of the United States Constitution and Article 1, Sections 19 and 23 of the North Carolina Constitution, "[a] defendant's right to counsel includes the right to effective assistance of counsel."
 
 State v. Braswell
 
 ,
 
 312 N.C. 553
 
 , 561,
 
 324 S.E.2d 241
 
 , 247 (1985) (citation omitted). In
 
 Braswell
 
 , our Supreme Court "expressly adopt[ed] the test set out in
 
 Strickland v. Washington
 
 [,
 
 466 U.S. 668
 
 ,
 
 104 S.Ct. 2052
 
 ,
 
 80 L.Ed.2d 674
 
 (1984),] as a uniform standard to be
 
 *97
 
 applied to measure ineffective assistance of counsel under the North Carolina Constitution."
 
 Braswell
 
 ,
 
 312 N.C. at 562-63
 
 ,
 
 324 S.E.2d at 248
 
 .
 

 On appeal, a defendant must show that counsel's conduct "fell below an objective standard of reasonableness" to prevail.
 
 Strickland
 
 ,
 
 466 U.S. at 688
 
 ,
 
 104 S.Ct. at 2064
 
 ,
 
 80 L.Ed.2d at 693
 
 . To meet this burden, the defendant must satisfy a two part test:
 

 First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance
 
 *559
 
 prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
 

 Id
 
 . at 687,
 
 104 S.Ct. at 2064
 
 ,
 
 80 L.Ed.2d at 693
 
 . Furthermore, a defendant alleging that counsel failed to carry out his duties with the proficiency required by the Sixth Amendment must identify the specific acts or omissions of counsel that were not the result of "reasonable professional judgment."
 

 Id.
 

 at 690
 
 ,
 
 104 S.Ct. at 2066
 
 ,
 
 80 L.Ed.2d at 674
 
 .
 

 A.
 
 Purported Impasse
 

 Defendant asserts that his counsel was ineffective by "failing to articulate for the record the specific nature of the problems between himself and the defendant leading to an impasse." We disagree.
 

 It is well established in our courts that "[t]actical decisions, such as which witnesses to call, whether and how to conduct cross-examinations, what jurors to accept or strike, and what trial motions to make are ultimately the province of the lawyer."
 
 State v. Ward
 
 , --- N.C. App. ----, ----,
 
 792 S.E.2d 579
 
 , 582 (2016) (citations and quotation marks omitted),
 
 disc. rev. denied
 
 ,
 
 369 N.C. 486
 
 ,
 
 795 S.E.2d 371
 
 (2017). "However, when counsel and a fully informed criminal defendant ... reach an absolute impasse as to such tactical decisions [during trial], the client's wishes must control...."
 

 Id.
 

 (citation omitted). However, no actual impasse exists where there is no conflict between a defendant and counsel.
 
 State v. Wilkinson
 
 ,
 
 344 N.C. 198
 
 , 211-12,
 
 474 S.E.2d 375
 
 , 382 (1996). Moreover, when a defendant fails to complain about trial counsel's tactics and actions, there is no actual impasse.
 
 State v. McCarver
 
 ,
 
 341 N.C. 364
 
 , 385,
 
 462 S.E.2d 25
 
 , 36 (1995),
 
 cert. denied
 
 ,
 
 517 U.S. 1110
 
 ,
 
 116 S.Ct. 1332
 
 ,
 
 134 L.Ed.2d 482
 
 (1996). In the case at hand, there was neither disagreement regarding
 
 *98
 
 tactical decisions, nor was there anything in the record which would suggest any conflict between defendant and defense counsel. Thus, no impasse existed.
 

 Defendant's arguments on this issue go solely to issues surrounding counsel having "no confidence in anything his client told him, and that he did not know what to believe when it came to [Defendant's] statements about the events of February 25, 2013." Defendant makes no argument rooted in law that an impasse existed, besides using conclusory terms. In addition, Defendant points to no authority which would require a finding of an impasse where defense counsel did not believe what a criminal-defendant client told him.
 

 Throughout the trial, defense counsel informed the court and Defendant of the nature of the concerns or disagreements the two had, but counsel specifically followed Defendant's wishes and desires concerning representation. Defense counsel gave the opening statement that he and Defendant agreed upon, despite counsel's knowledge that what he was relaying to the jury was inconsistent with the Defendant's newly discovered veracity. If Defendant was "fine with that," as he informed the court, no impasse existed. This is true regardless of defense counsel's personal conflict, ethical quandary, or Defendant's perceived malleability of the truth.
 

 Defendant was the sole cause of any purported conflict that developed, and there has been no reasonable or legitimate assertion by Defendant that an impasse existed that would require a finding that counsel was professionally deficient in this case. Because Defendant, of his own free will, was in agreement with counsel as to the actions to be taken at trial, Defendant's contention that his counsel was ineffective is without merit, and this IAC claim is denied.
 

 B.
 
 Failure to Cross-Examine Witness
 

 Defendant also alleges trial counsel provided ineffective assistance when he did not cross-examine witness Tarod Ratlif for a third time to inquire about his "recollection concerning who actually shot the victim." Defendant asserts that additional questioning "would have supported his theory" that Brandon Thompson ("Thompson") killed Ronny Steele. Defendant concedes that no additional investigation is needed, and this issue can be decided on the merits.
 

 Ratlif testified on direct examination that a group that included Defendant and a group
 
 *560
 
 that included Thompson exchanged gunfire on the evening Steele was killed.
 

 *99
 
 Q. Okay. Can you tell me-could you tell from where the gunshots were coming?
 

 A. Yes.
 

 Q. And from where did you hear gunshots coming?
 

 A. From both sides of me, from the left and the right.
 

 Q. So you can hear them coming from your left side and your right side?
 

 A. Yes, sir.
 

 Q. And do you know exactly how many gunshots you heard?
 

 A. No, sir. Not today.
 

 Ratlif testified that after the shooting, Steele informed him he was hit, but Ratlif did not believe Steele.
 

 In discussions with the trial court and Defendant regarding Ratlif's testimony, defense counsel stated, "Recalling Mr. Ratlif-think I went about as far with Mr. Ratlif as I could do based upon what I knew...." The trial court, regarding counsel's questioning of Ratlif, stated:
 

 But I thought that in your cross-examination of Mr. Ratlif and [another witness] that you set forth the theory that this, A, may not have been a robbery at all; and B, once somebody other than [Defendant] may have shot Mr. Steele in this gun battle. And I think you argued that this was a gun battle in your opening remarks. Nobody on the stand so far has pointed a finger at [Defendant] as the perpetrator of any crime.
 

 That prompted the following exchange between the trial court and Defendant:
 

 DEFENDANT: I just want to state that I am concerned with his confidence of going forward as far as with the-you know, his ability to be a fully effective, but I am-I am-I have been satisfied with his service so far and I feel like I wouldn't rather any different attorney be my attorney unless, you know, he is at the point to where he can't be fully effective going forward.
 

 THE COURT: He's a professional. He can-[defense counsel] has said under my questioning, he's protecting
 
 *100
 
 your rights. He's not divulging matters that-client confidentiality matters. He's not divulging them. He's done, I thought, a fine job of setting forth your theory of the case so far that someone else shot Mr. Steele or maybe shot in a gun battle. That Mr. Ratlif or [another witness] has pointed a finger at you.
 

 And I thought [defense counsel] did a good job of cross-examination pointing out conflicts in their testimony and their statements to the police in their prior testimony and prior matters involving the death of Mr. Steele. I know there have been prior trials where Mr. Ratlif and [another witness] testified. And I thought [defense counsel] pointed out some good conflicts. You know what I mean by that?
 

 DEFENDANT: Yes, sir.
 

 THE COURT: Some statements they made earlier that were different from the statements they were making in this trial.
 

 Did you think [defense counsel] did a good job of that?
 

 DEFENDANT: Yes, sir.
 

 THE COURT: Okay. So as we go forward, he's going to-he's going to keep me advised if you-if we reach a stage where you want a particular thing to happen with your case and you don't think [defense counsel] understands it or is going to do it, as long as it's a lawful request and you're-and you're not asking him to violate the law or perpetuate a fraud upon the [c]ourt and as long as any request that you make of [defense counsel] can be supported by a good faith argument for an extension modification or reversal of existing law, then he will comply with your wishes as the trial progresses in defending your case the way that you want to defend it. Okay?
 

 DEFENDANT: Yes, sir.
 

 THE COURT: And at this point, you are satisfied with [defense counsel's] representation of you in this trial?
 

 DEFENDANT: Yes, Your Honor. I've been satisfied with [defense counsel].
 

 Defense counsel in his motion to withdraw did state that he was concerned that his failure to ask additional questions regarding
 
 *561
 

 *101
 
 Thompson's actions may have precluded jury instructions consistent with
 
 State v. Bonner
 
 ,
 
 330 N.C. 536
 
 ,
 
 411 S.E.2d 598
 
 (1992), and
 
 State v. Oxendine
 
 ,
 
 187 N.C. 658
 
 ,
 
 122 S.E. 568
 
 (1924). Defendant acknowledges and the transcript reveals, however, that the trial court gave instructions consistent with
 
 Bonner
 
 and
 
 Oxendine
 
 . In addition, defense counsel argued in closing:
 

 And we know Brandon Thompson had a gun. But you haven't seen Brandon Thompson come into this courtroom. We know Brandon Thompson was shooting because Tarod Ratlif said he was shooting, but you haven't seen Brandon Thompson come into this courtroom and testify to you under oath that he did not have a gun. And if he had a gun, why didn't he give it to the police? He hasn't come in.
 

 Ratlif testified that he heard gunfire coming from the direction of Defendant and Thompson. He also testified that Thompson had a gun and did not deny that Thompson had shot the gun. Counsel's questioning allowed him to argue to the jury that someone other than Defendant shot Steele. As the trial court noted, defense counsel "set forth the theory that this ... may not have been a robbery at all; and ... somebody other than [Defendant] may have shot Mr. Steele in this gun battle."
 

 In fact, Defendant concedes in his brief that the jury considered whether Thompson shot Steele. During deliberations, the jury submitted the following question to the trial court: "If [Thompson] shot and killed [Steele,] how would that apply to element [two]?" While the prosecutor provided language that he believed addressed the jury's question, it was Defendant who requested the following instruction be given: "The killing of Ronny Steele must be the act of the [D]efendant or by someone with-with whom the [D]efendant was acting in concert."
 

 The trial court addressed several items with the jury, and then discussed the question regarding Thompson:
 

 THE COURT: The next is actually a question. The next thing says, "If [Thompson] shot and killed [Steele], how would that apply to element two?"
 

 In response to that question, this is the response from the Court:
 

 The killing of Ronny Eugene Steele must be by an act of the Defendant, Reuben Timothy Curry, or by an act of someone with whom the [D]efendant was acting in concert with.
 

 *102
 
 Does that answer that question?
 

 [JUROR]: Yes, sir.
 

 The jury was properly instructed that Defendant could only be convicted if he, or "someone with whom the [D]efendant was acting in concert with" killed Steele. The jury deliberated on and considered whether Thompson shot Steele based on the question they submitted.
 

 Even if we assume that Defendant satisfied the first
 
 Strickland
 
 prong for both issues, which he has not, Defendant cannot satisfy the second prong as there is no showing of prejudice. There was sufficient evidence before the trial court that Defendant, or those acting in concert with Defendant, shot and killed Steele. Defendant was at the crime scene. Defendant was convicted because he was a participant in an attempted robbery and ensuing "gun battle" during which Steele was fatally shot, even if he may not have fired the fatal bullet. There is no reasonable probability of a different result in this case. Based upon the abundant evidence in the record, Defendant's IAC claims are denied.
 

 Conclusion
 

 Upon consideration of the record herein and the arguments of counsel, we conclude the trial court did not abuse its discretion in denying defense counsel's motion to withdraw, and Defendant's IAC claims are denied.
 

 NO ERROR IN PART; DENIED IN PART.
 

 Judge DILLON concurs.
 

 Judge ZACHARY concurs in result only.
 

 [1]
 

 Rule 1.1 Competence
 

 [2]
 

 Rule 1.3 Diligence
 

 [3]
 

 Rule 1.7 Conflict of Interest: Current Clients
 

 [4]
 

 Rule 1.16 Declining or Terminating Representation
 

 [5]
 

 Rule 1.6 Confidentiality of Information