IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-223

Filed 7 May 2025

Mecklenburg County, Nos. 21CRS233408-590, 21CRS233409-590, 22CRS1767-590

STATE OF NORTH CAROLINA

v.

DAVIDSON NEVILLE HENDERSON, Defendant.

Appeal by defendant from judgment entered 29 June 2023 by Judge Reggie E. McKnight in Superior Court, Mecklenburg County. Heard in the Court of Appeals 24 September 2024.

*Attorney General Jeff Jackson, by Special Deputy Attorney General M. Lynne Weaver, for the State.*

*Assistant Public Defender Julie Ramseur Lewis for defendant-appellant.*

STROUD, Judge.

Defendant Davidson Neville Henderson appeals from a judgment entered upon a jury's verdict finding him guilty of carrying a concealed gun, possession of a firearm by a felon, and having attained habitual felon status. On appeal, Defendant argues that: (1) the trial court erred in failing to instruct defense counsel when an absolute impasse occurred; (2) the trial court erred in failing to declare a mistrial *ex mero motu*; and (3) he received ineffective assistance of counsel. After careful review, we conclude there was no error in part and dismiss Defendant's ineffective assistance of counsel

claim without prejudice to his right to assert the claim in a motion for appropriate relief.

## I. Factual Background and Procedural History

On 21 October 2021, Officer Kevin Jackson and Officer Robert Preston of the Charlotte-Mecklenburg County Police Department were conducting surveillance at a gas station that was known for drug-related activity. According to testimony offered at trial by the officers, their vehicle was between the gas pumps and the store when they saw Defendant walk in front of their vehicle, "wearing a ski mask" "just above his head" but his "eyes, mouth, and nose" were visible. Defendant pulled the black ski mask "down to where his eyes [we]re only exposed." Officer Jackson believed that "[i]n 79-degree weather, pulling a mask over your face once you see police . . . is an attempt to conceal your identity." Defendant "then does a 180 and walks back to [his] vehicle." The officers ran the license plate on the vehicle and determined that Defendant had an outstanding warrant for his arrest. Defendant exited the parking lot of the gas station in his vehicle; the officers followed Defendant's vehicle and conducted a traffic stop within "less than a mile."

Defendant also testified at trial. He testified that he was wearing the ski mask that day for "COVID protection reasons because [Ms. Eden] was pregnant." Defendant said he had pulled his vehicle into the gas station, went inside, paid, and *after* he was "finished pumping the gas and closed the pump and was walking back to the driver's side," he saw the officers. Defendant testified that he "got in the car[,]

- 2 -

[he] sat there for probably like, I don't know, 30 seconds, 20, 30 seconds, and pulled off, and then went back to like, up [Interstate] 77 way" before being pulled over.

The officers further testified at trial that after pulling Defendant over, Officer Jackson asked for his driver's license to confirm whether he was the individual with an outstanding warrant. After he confirmed that Defendant was the individual with the outstanding warrant, Officer Jackson asked Defendant to exit his vehicle and informed him that he was being detained. After placing Defendant in handcuffs, Officer Jackson frisked Defendant and felt what he "immediately knew to be a revolver in [Defendant's] right front pocket." He announced "94", a law enforcement code to "let everybody know on scene that there is a firearm in play." Officer Preston then "reached into [Defendant's] right front pocket and retrieved the revolver." The body-worn camera ("BWC") video from Officer Preston's camera clearly shows Officer Preston removing the silver .38 caliber revolver from Defendant's front pocket. Defendant was then placed under arrest for carrying a concealed handgun.

Officer Jackson then returned to Defendant's vehicle and asked the passenger, Ms. Eden, to get out. He frisked her also to make sure "she didn't have any weapons on her." He then checked "to see if there w[ere] any firearms in the vehicle." He found in the center console a green-leafy substance he believed to be marijuana and a "long black tube sock" containing "more .38-caliber rounds," which was "the same caliber of ammunition for the revolver that had been recovered."

Officer Preston testified that while he was in the police vehicle checking

information on the computer, Defendant was in the back seat. While they were in the vehicle, Defendant made a "spontaneous utterance." He said, "I keep it for protection." This statement was not captured on his BWC audio. He testified this should have been on the video, but with the "road noise, the radio noise" and "the layer of plastic and metal between" the front and back seats, this statement was not captured.

Officer Jackson transported Defendant to the police station after his arrest. After Defendant waived his *Miranda* rights, Officer Jackson asked him about the gun. Defendant

> said that he knew that he wasn't supposed to have a firearm because he is a convicted felon, but he kept it on him because of the rise in crime trends in Charlotte. He blamed the crime trends on some of the local rappers. So he said he would rather have it on him for protection.

On 1 November 2021, Defendant was indicted upon a true bill of indictment for two counts of carrying a concealed weapon and possession of a firearm by a felon. The matter came on for trial 26 June 2023.

At the start of the second day of trial, the State requested that the trial court read into the record "at some point today before the State rests" the stipulation Defendant had agreed to, that on 14 May 2018, he had been convicted in Mecklenburg County of a felony "committed on June 10, 2016, in violation of the law of the state of North Carolina" that "made it unlawful for . . . [D]efendant [ ] to possess a weapon." The State also informed the trial court that it would be presenting two videos from

the BWCs during the testimony of Officer Preston. The State noted some concerns regarding a portion of the audio on the video identified as State's Exhibit No. 5:

> [THE STATE]: [Defense counsel] and I discussed that when I introduce that exhibit, at about four minutes and 19 seconds into that video, I will be muting it because after that point in time, there is a substantial discussion between Officer Preston and the female passenger. [Defense counsel] advised me that he had concerns about the relevance of that, of those portions of the video, and so the State is agreeing not to play the audio of the rest of Officer Preston's BWC.

The State also noted that:

> I know that the [S]tate has elicited testimony regarding the reason for the stop and the search in this case was that . . . Defendant had an active warrant for his arrest. The [S]tate has been taking steps to make sure that it has not been elicited that the warrant for his arrest was for his parole violation, and up to this point, I don't believe that that evidence has been elicited.

The State asked that since the basis for the stop of Defendant's vehicle was the warrant for arrest for a parole violation, "at the appropriate time, the State would ask that you give the jury a limiting instruction that they are not to consider the fact that he had a warrant for his arrest as propensity evidence." The trial court agreed to instruct the jury, stated the proposed instruction, and Defendant had no objection to this instruction.

At this point, Defendant's attorney informed the trial court of his client's concerns regarding the muted audio:

> [DEFENSE COUNSEL]: For the record, because my client

and I have some disagreements as to strategy, I made an agreement with the district attorney regarding not playing the audio of the portion with Ms. Eden[ ].

THE COURT: The passenger, yes.

[DEFENSE COUNSEL]: The passenger.

THE COURT: Yes, sir.

[DEFENSE COUNSEL]: [Defendant] tells me *he wants it all heard. I don't think that's a good idea.* I don't think it adds anything to his case, and it is my belief that it should not be played. I wanted to at least put on the record *that he disagreed with that decision. He wanted to say that.*

THE COURT: All right. So we'll note for the record that there is evidence as relates to the [BWC] footage from a witness who hasn't testified yet, Officer Preston. *It is anticipated that that testimony or that footage will contain hearsay evidence, and so the exhibit of that is what you may want to have a conversation with your client about. Well, I guess that's for y'all to discuss strategy.* That you don't have to answer for him on the record.

[DEFENSE COUNSEL]: *I'm not wanting it in there,* anyway, *but he is* - -

THE COURT: Understood.

[DEFENSE COUNSEL]: *I'm informing the court.*

THE COURT: Understood. *But that's your client's wish,* potentially, *that that hearsay evidence be admitted.* Court would note that, for purposes of the record, *that is a discussion that defense counsel has had with [Defendant] in this matter, and that it is [Defendant]'s wish that that information, if not objected to, be admitted into evidence. So we'll note that for the record in terms of what [Defendant] wishes.*

[THE STATE]: And I'll also let the court know that that

video clip [that] we had contemplated muting, which does contain what the [S]tate would contend is inadmissible hearsay, also contains several references to the reason for the arrest warrant, which is [Defendant]'s parole violation. So should [Defendant] introduce that, I'm just putting that on the record.

THE COURT: Okay. So with regard to that type of information, once again, we'll note that for the record. [Defense counsel], I mean, the two items that the court has heard about thus far are two items that may or may not be admissible under the rules of evidence as it relates to that type of information, be it in any format, the testimony, video, et cetera. *But that is completely contingent upon strategically what happens as relates to the defense in this matter, which obviously we do not need to put that on the record, but those two items, the court would note just peremptorily, sounds as though they are matters that may have admissibility issues, depending on what the defense decides to do if they are elicited at that time.* I believe that's all we can do as far as the record is concerned.

(Emphases added.)

Immediately after the discussion above, the State requested that "[t]o the extent that we do move forward with the contemplated plan of muting the video, I ask also that at this point you give an instruction to the jury not to speculate as to what's being said."

[DEFENSE COUNSEL]: And I guess I would just say because they would - - just not for their consideration without giving them any further, whether it's admissible or not.

THE COURT: All right. As to the request for a limiting instruction regarding the potential admissibility of a second portion of [BWC] footage, the court would provide the following instruction. The court will hear from the

parties if they have any other recommendations. Members of the jury, you will now hear portions of the audio/video footage. Certain portions of this footage will be muted or not heard by you. You should not speculate or concern yourself with those portions [that] are not played. You're only to consider the portions that have been played for you as evidence in this case.

[THE STATE]: That's acceptable to the [S]tate, your honor. Thank you.

[DEFENSE COUNSEL]: *We already put your concerns on the record.*[1] I'm fine with the instruction, your honor. We put on the record your disagreement with not playing it.

[DEFENDANT]: I have a question, [j]udge. Can I speak to the judge? *Is that fine with you*?[2]

[DEFENSE COUNSEL]: It's up to the judge whether he wants to hear from you.

THE COURT: All right. Well, [Defendant], I just have to let you know, [Defendant], everything that we're saying here obviously is being transcribed. You are on trial here.

[DEFENDANT]: Yes, sir.

THE COURT: And so you have the right to remain silent. You also have the constitutional right to testify, but what we're talking about now is not testimony. We're talking about you kind of having a conversation with me, and that typically just doesn't happen. *So I would just caution you, have the conversation with your defense counsel.* What we have been discussing are legal items, evidence, issues that are really in the field and spectrum of your lawyer. They are not anticipated for you to understand or know, and so the best way I can really describe this to you is strategically and legally, *you need to have those conversations with your lawyer about this evidence that we're talking about and its*

---

[1] It appears defense counsel was speaking to Defendant, as he noted "your concerns."

[2] It is not clear whether Defendant was speaking to defense counsel or to the trial court.

*admissibility, what admissibility means, that type of thing.
That's kind of the best place for that to happen because I
can't give you legal advice. That's what an attorney is for.
But that's what we[']re talking about. And I'm not saying
y'all didn't have that conversation already. I'm simply
saying that's the best place to have it because I can't give
you legal advice. That's not my role. I can't do that.*

[DEFENDANT]: Okay. Thank you.

THE COURT: But that's what we're talking about as far as
the audio and that kind of thing. *My understanding is you
have seen it, you have heard it, but obviously during breaks,
lunch, et cetera, or now, please feel free to take a moment if
you[ ] all need to talk about that in some more depth.*

(Emphases added.)

On 29 June 2023, Defendant was found guilty upon a jury's verdict of carrying

a concealed gun, possession of a firearm by a felon, and having attained habitual felon

status. From this judgment, Defendant entered oral notice of appeal in open court.

## II.    Discussion

### A. Purported Impasse

In the first of three issues Defendant presents on appeal, Defendant contends

that "the trial court erred in failing to comply with the mandates of *State v. Ali* and

in failing to instruct trial counsel to comply with [Defendant]'s wishes as to the

playing of the audio portion of State's Exhibit No. 5, a videotape, where an impasse

on trial tactics was apparent and absolute."

> It is well established in our courts that tactical decisions,
> such as which witnesses to call, whether and how to
> conduct cross-examinations, what jurors to accept or
> strike, and what trial motions to make are ultimately the

province of the lawyer. However, when counsel and a fully informed criminal defendant reach an absolute impasse as to such tactical decisions during trial, the client's wishes must control. However, no actual impasse exists where there is no conflict between a defendant and counsel. Moreover, when a defendant fails to complain about trial counsel's tactics and actions, there is no actual impasse.

*State v. Curry*, 256 N.C. App. 86, 97, 805 S.E.2d 552, 559 (2017) (citations, quotation marks, brackets, and ellipses omitted).

This Court recently summarized the law regarding disagreement between a defendant and counsel regarding strategic decisions at trial in *State v. Jackson*:

Our Courts have previously recognized certain decisions, relating to the conduct of a case, are to be made by the accused, while other strategic and tactical decisions, such as what and how evidence should be introduced, are to be made by defense counsel after consultation with the defendant. However, where the defendant and his defense counsel reach an absolute impasse and are unable come to an agreement on such tactical decisions, the defendant's wishes must control. Notably, upon reaching an absolute impasse, defense counsel should make a record of the circumstances, her advice to the defendant, the reasons for the advice, the defendant's decision and the conclusion reached.

In *State v. Floyd*, the defendant argued, on appeal, the trial court failed to adequately address an impasse between the defendant and his counsel regarding certain unidentified questions the defendant wanted to be asked of a witness. Further, the defendant argued the trial court's failure to instruct his counsel to comply with his wishes amounted to a denial of his constitutional right to control his defense and confront a witness. Our Supreme Court stated, while the defendant did tell the court his attorney was not asking the questions the defendant told him to ask, the record did not shed any light on the nature or the substance of those

questions. Further, the Court also recognized the defendant was generally disruptive throughout trial and was forced to leave the courtroom, which led him to have a consultation with his attorney, while the witness, to whom he wished to ask the desired questions, was on the witness stand. Accordingly, our Supreme Court held it was unable, without engaging in conjecture, to determine whether the defendant had a serious disagreement with his attorney regarding trial strategy and therefore could not determine, from the cold record, whether an absolute impasse existed.

*State v. Jackson*, 292 N.C. App. 616, 619-20, 899 S.E.2d 34, 38-39 (2024) (citation and quotation marks omitted).

As discussed above, in *State v. Floyd*, the Supreme Court of North Carolina was unable to determine "from the cold record whether an absolute impasse" as described in *Ali* existed. 369 N.C. 329, 337, 794 S.E.2d 460, 466 (2016). In *Floyd*, the defendant "did not believe defense counsel was asking the right questions" of a certain witness:

> [The] defendant told the trial court that his attorney was not asking the questions [the] defendant told him to ask Detective Braswell; however, *the record does not shed any light on the nature or the substance of those desired questions.* We note that [the] defendant was generally disruptive throughout trial, was forced to leave the courtroom when this behavior escalated while Detective Braswell was on the witness stand, and had to consult with his attorney outside of court thereafter. In light of [the] defendant's disruptive behavior, we cannot ascertain, without engaging in conjecture, whether [the] defendant had a serious disagreement with his attorney regarding trial strategy or whether he simply sought to hinder the proceedings. *As a result, it cannot be determined from the cold record whether an absolute impasse existed as described in Ali.*

*Id.* at 340-41, 794 S.E.2d at 467-68 (emphasis added).

Here, unlike *Floyd*, the record does show "the nature and substance" of the evidence Defendant and defense counsel disagreed on. Defense counsel wanted the audio portion of the State's Exhibit No. 5 to be muted during the portion of the video where Officer Preston was speaking to Ms. Eden. In this portion of the video, Officer Preston takes the gun he removed from Defendant's pocket, gets an evidence envelope for the gun, and secures the gun in the back of the police vehicle. Ms. Eden is standing at the front of the car, drinking from a cup with a straw. Officer Preston then asks Ms. Eden, did "[y]ou know he had that gun on him the whole time?" She slowly shakes her head to indicate "no" and then says "no." Officer Preston tells her that they ran Defendant's tag and it showed Defendant had a warrant for arrest, so they put Defendant in handcuffs.

During the entire video, there is substantial road noise from the passing vehicles on Interstate 77. Ms. Eden asks "why" and the rest of the question is indecipherable. Officer Preston answers "parole violation"; Ms. Eden indicates she could not hear, so he repeats "parole violation." Officer Preston then asks Ms. Eden for her name, date of birth, and contact information; she provides the information requested as Officer Preston writes it on a notepad.

Based upon the colloquy with the trial court, defense counsel wanted to mute this portion of the audio because Officer Preston told Ms. Eden that Defendant was being arrested for a parole violation. The State wanted this portion of the video

muted because of hearsay from Ms. Eden, since she did not testify at trial. Defendant wanted the audio to be heard because Ms. Eden said "no" when she was asked if she knew Defendant "had that gun on him the whole time." Defendant testified in his own defense, and he testified that he did not have a firearm that day at all. He testified that Officer Preston had planted the gun on him and he had never seen the gun before. Defendant believed Ms. Eden's answer of "no" to Officer Preston's question would support his contention that he did not have a gun that day.

The record also shows that defense counsel advised the trial court of the disagreement before the presentation of Officer Preston's testimony and State's Exhibit No. 5, and the trial court addressed this issue with Defendant. The substance of the strategic disagreement was clear on the record, but the record does not show an absolute impasse. Instead, the trial court advised Defendant that he would need to "have those conversations with [his] lawyer about this evidence that we're talking about and it's admissibility, what admissibility means, that type of thing." The trial court noted that, "[m]y understanding is you have seen it, you have heard it, but obviously during breaks, lunch, et cetera, or now, please feel free to take a moment if you[ ]all need to talk about that in some more depth." Defendant did not indicate any further "need to talk about that in some more depth."

After this discussion regarding the conflict at the start of the second day of trial, Officer Jackson testified first, and then Officer Preston testified. Officer Preston testified about his participation in the traffic stop including his interaction

with Ms. Eden. During Officer Preston's testimony, the State offered State's Exhibit No. 5, which was ultimately played for the jury, but the audio was muted at the 4:19 mark as previously discussed. Our record reveals no further discussion, objection, or question regarding Defendant's request for the audio recording to be played in its entirety before the presentation of the video.

Immediately after the video was shown, the trial court excused the jury for a break, and inquired of defense counsel as to any "housekeeping matters" they may need to address "outside the presence of the jury." The State noted that defense counsel had mentioned Defendant's "parole" in front of the jury so it would be appropriate to give a limiting instruction as previously discussed, since the arrest warrant arose from a parole violation.[3] The State also noted its previous request for the stipulation regarding Defendant's felony conviction to be read to the jury. Defense counsel had no requests or objections. After the break, defense counsel proceeded with his cross-examination of Officer Preston.

Based upon the record, Defendant and his defense counsel did not come to an "absolute impasse." They initially had a disagreement regarding a strategic or tactical decision as to presentation of evidence. Defense counsel advised the trial court of this disagreement, and the trial court adequately addressed the

---

[3] During cross-examination of Officer Jackson, defense counsel asked, "Was it you or Officer Preston that informed [Defendant] of the parole issue?" He also asked, "Was [Defendant] under arrest for the parole hit at that point?"

disagreement. Defendant had the opportunity to "talk about that in some more depth" with defense counsel *after* the colloquy with the trial court. When the evidence in question was introduced, neither Defendant nor his defense counsel raised any further concerns. Immediately after State's Exhibit No. 5 was played, with the muted audio, the trial court asked if there were any "housekeeping" matters to address, and again, Defendant did not raise any further concerns. This record shows an initial disagreement between Defendant and his defense counsel, but not an "absolute impasse." Therefore, Defendant has failed to demonstrate any error based upon the exclusion of the audio portion of State's Exhibit No. 5.

## B. Mistrial

In his second issue on appeal, Defendant argues that the trial court "erred in failing to declare a mistrial *ex mero motu* where inadmissible and highly prejudicial evidence regarding [Defendant]'s possession of suspected marijuana and a stack of temporary license plate tags was introduced by the State."

"Whether to grant a motion for mistrial is within the sound discretion of the trial court, and its ruling will not be disturbed on appeal unless it is so clearly erroneous as to amount to a manifest abuse of discretion." *State v. Jaaber*, 176 N.C. App. 752, 756, 627 S.E.2d 312, 314 (2006) (citation omitted). However, at the outset, we note that Defendant did not object to this evidence at trial, therefore, this argument is unpreserved. *See* N.C. R. App. P. 10(a)(1) ("In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request,

objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context.").

"[A]n issue that was not preserved by objection noted at trial and that is not deemed preserved by rule or law without any such action nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error." N.C. R. App. P. 10(a)(4). Here, Defendant does not "specifically and distinctly" allege that this unpreserved issue is subject to plain error review, consequently, we deem this argument abandoned.

## C. Ineffective Assistance of Counsel

Finally, Defendant argues that he "was denied the effective assistance of counsel where his trial counsel failed to object and move for a mistrial after improper evidence was admitted."

Generally, "[t]he accepted practice is to raise claims of ineffective assistance of counsel in post-conviction proceedings, rather than direct appeal." *State v. Dockery*, 78 N.C. App. 190, 192, 336 S.E.2d 719. 721 (1985). A motion for appropriate relief is preferable to a direct appeal because to

> defend against ineffective assistance of counsel allegations, the State must rely on information provided by [the] defendant to trial counsel, as well as [the] defendant's thoughts, concerns, and demeanor. Only when all aspects of the relationship are explored can it be determined whether counsel was reasonably likely to render effective assistance. Thus, superior courts should assess the

allegations in light of all the circumstances known to
counsel at the time of representation.

*State v. Buckner*, 351 N.C. 401, 412, 527 S.E.2d 307, 314 (2000) (citation, quotation marks, and brackets omitted).

Ineffective assistance of counsel "claims brought on direct review will be decided on the merits when the cold record reveals that no further investigation is required, i.e., claims that may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing." *State v. Fair*, 354 N.C. 131, 166, 557 S.E.2d 500, 524 (2001) (citations omitted). However, "should the reviewing court determine that IAC claims have been prematurely asserted on direct appeal, it shall dismiss those claims without prejudice to the defendant's right to assert them during a subsequent MAR proceeding." *Id.* at 167, 557 S.E.2d at 525 (citation omitted).

For a criminal defendant to prevail on an ineffective assistance of counsel claim, the defendant "must show that counsel's representation fell below an objective standard of reasonableness" and "that there is a reasonable possibility that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694, 80 L. Ed. 2d 674, 693, 698 (1984); *see also State v. Braswell*, 312 N.C. 553, 562-63, 324 S.E.2d 241, 248 (1985) (adopting the *Strickland* test for ineffective assistance of counsel in North Carolina).

After careful consideration, we conclude that we are unable to decide

Defendant's ineffective assistance of counsel claim based on the cold record before us. Consequently, we dismiss any ineffective assistance of counsel claims, without prejudice, to permit Defendant to pursue a MAR in the trial court.

### III.    Conclusion

We conclude that Defendant failed to demonstrate that he and defense counsel reached an impasse regarding the exclusion of a small portion of the audio of State's Exhibit No. 5.  Defendant did not argue plain error as to the admission of evidence of the suspected marijuana and temporary license plates, so this issue was abandoned on appeal.  Because we conclude that the cold record before us on appeal does not allow us to review Defendant's IAC claim, we dismiss that claim without prejudice to Defendant's right to bring that action in a subsequent MAR proceeding before the trial court.

NO ERROR IN PART; DISMISSED IN PART.

Judges ZACHARY and HAMPSON concur.